May it please the Court, I'm Alan Milstein. I represent Nicole Weber. You have a civil case now. This is not a regal stangle case. As this Court is well aware, parallel claims are not preempted by the MDA, and manufacturing defect claims are parallel claims. This is an Iqbal Twombly case. The district court essentially said that we had to prove our case at the pleading level, and that we did not plead enough to show, plausibly, that there was a manufacturing defect claim. And we did. I gather that there was more evidence in the record that isn't in the complaint with regard to the condition of the implant, showing that it was reduced in size and so they're confirming that there was bleeding and maybe some other material. There seems to be more there than is in the complaint. Is that correct? Well, paragraph 77 of the complaint, Your Honor, says essentially that the pathology report, which reflected an examination of the implants after explantation, evidence a substantial bleed. So there were two essential bases for, and they were both logistical syllogisms. The pathology report as to the extracted breast implant? Correct. Found a tear or fissure from which there was substantial gel bleed? No, Your Honor. What did it find? Allergan admits that in the absence of a rupture, in the absence of a tear, that there will be a bleed of the silicone. But Allergan says in its materials that were provided to the FDA that that is an extremely small quantity and that whatever quantity does bleed is not clinically significant. That's not what it says. It says small quantities of low molecular weight silicone compounds. And I take a silicone compound has the element of manganese in it? Correct. All right. As well as platinum in zero oxidation state have been found to diffuse per-end bleed, close per-end, through an intact implant shell. The evidence is mixed as to whether there are any clinical consequences associated with gel bleed. That's a warning, is it not? No. Now, is small quantities, gel bleed, mixed results, right? Later on, at the very bottom, it says the overall body of available evidence supports that the extremely low level of gel bleed is of no clinical significance. That's correct. It's of no clinical significance. Consequence, right. So we have two logistical syllogisms, essentially. That is, one logistical syllogism is if the bleed is of significant, and the pathology report says it evidences a significant bleed, then, therefore, it was not in accordance with the manufacturing specifications. But you said in the hearing, although it's not in the complaint, because the court said that if they were removed, you should be able to determine how much leaked out. And you said, and the court said if there are controls that are planted with the implants, and you say what I don't know is how much gel bleed allergen expected. We do know what the implants look like after they were removed and how much gel was out of those implants, which was significant, not a minuscule amount. Now, there's nothing in the complaint that says that, right? In the complaint, in paragraph 77, it says that the pathology report evidenced a significant gel bleed. But it doesn't say that the – I would have understood that to mean that the pathology report, meaning what was wrong with her. No. The pathology report talked about the weight of the – and again, the pathology report is not part of the record, because, again, we were just at the pleading  We didn't attach to the – But in any event, you could amend the complaint to say what you said here, more specifically. The pathology report weighed the – I mean, we know what the implants weighed, what the amount of the – But the complaint doesn't say any of that, and that's why Judge Bain was confused and I was confused and the court was confused, because it's not in the complaint. What is in the complaint is that the pathology report, which reflected an examination of the implants after explantation, evidenced a significant gel bleed. I don't know how much clearer it needed to be. Well, you might have said, in addition, and one of the reasons we know this, in addition to the symptoms suffered by your client, is that we looked at the actual body and we could tell that there had – there was a diminished amount – a significantly diminished amount of silicone in them after they were removed. Who said that? Well, I didn't have the implants, and the implants were discarded after explantation, which is one of the things that the judge was troubled with. But does the pathology report say what I just said? The pathology report says that these – this is the amount of gel that was left in it, and I think it was something like 2.8 percent had been bled out. Again, this is not in the record. This is in the pathology report. Something like 2.8 percent of the gel had been bled out. Well, you could have said that in addition to what you said, although you do say the pathology report and the nature and extent of her injury – so you've got two things, the report and her symptoms – evidenced a significant gel bleed. That's right. What else – at the pleading stage, what else were we required to do? That's the question, right? Right. And then with respect to logistical syllogism of her symptoms, the FDA is – the information given by Allergan is that whatever amount bleeds out is not clinically significant. Now, this is a woman who's now going – Their materials say an extremely low level of gel bleed is of no clinical consequence. Well, what you say is that there was a significant amount of bleed and we have extreme symptoms.  In other words, you say exactly the opposite happened to her. And if she has consequences that are serious – and this is a woman, an attorney in the state of Arizona, is now going blind because of the particular adverse reaction to the silicone – then therefore that is of clinical significance, and the amount that bled out must have been something other than a small amount. You also say in the complaint and repeated in your brief that there were heightened levels of manganese. Is that what it's called? That's correct. But you never connect that up with anything. Is there manganese in silicone? In the compound, yes. That's correct. Did you ever allege that? I mean, I don't know these things just off the top of my head. It's in the – well, it's in the – It's not in the complaint. All it says is that there was lots of manganese, but it doesn't explain why that matters. Excuse me. And that that evidence is a significant gel bleed. Right. But you never say why. Why, I gather, is because manganese is in the gel? Is in the manufacturing process with respect to what is inside. But again, all we did was plead under notice pleading what it is that we knew at the time. Okay. I'm just telling you that I needed – that I did not – I assumed that that's what you must have meant, but it was an assumption because it's not in there. So what is it that we – All of a sudden this manganese shows up and you don't know why it's there. You know, as a number of courts have said in product liability cases, the manufacturer has all of the evidence. They have all of the information that we would need. Not so quick, Mr. Milstein. You've just told me that the amount of gel bleed which was found by the pathologist, although that was not pleaded, was 2.8 percent of the silicon compound. 2.8 percent might be small quantities have been found to infuse bleed through an intact implant shell. If that were a small quantity, that wouldn't be a violation of the FDA because the warning wouldn't be there. And, Judge May, what we would get in discovery is from Allergan, Allergan, when you said small quantities, how much – if an implant is properly manufactured, how much bleed would you expect over this period of time? And actually, the Allergan – again, this is in the record, but it's much less than 1 percent is what they say in their materials. And so if three times the amount has bled out and that as a result of what has bled out has caused problems that are clinically significant, then under our logistical syllogism, there must have been a manufacturing defect. That is, these silicon implants were not as they were supposed to be and as they were represented to be by the – to the FDA. I mean, we're – again, we're at the very early stages. So we need to know from Allergan, have you done tests on the – have you done the bleeding test on these silicon implants? How much would you expect to bleed out? If you were granted leave to amend, you could go back and tell – and allege that the amount found in – to have bled from the silicon implant was 2.8 percent, and the manufacturer had in its own materials found that small quantities, as described in its FDA description, were at most 1 percent, so this was triple the amount. But Judge May, aren't we entitled to know from Allergan and actually get the documents that say exactly how much bleed we can expect? If you know that to be a fact and you allege it, we have to take it as true. All of our facts that we allege should have been taken as true, that there was a significant gel bleed. You don't need discovery to allege what we've just been discussing, do you? Well, I mean, frankly, Your Honor, you know, some of these materials came out after the case had been dismissed. I mean, we need to know from Allergan – I was positing that you'd be given leave to amend. You have these facts now. Is there any reason why you couldn't include them in your next amended petition? We could, but again, what we would prefer is, since we've alleged a significant gel bleed and we've alleged clinically significant adverse reaction to a gel bleed, that we are allowed to do some discovery. You know, the cases all say that in product liability cases, if you put this kind of burden on a plaintiff, it makes it impossible to actually lead a plausibility claim. But obviously, I mean, this would be – the other cases that have looked at similar problems have required a lot more than this. I understand why you don't want to do it or you can't do it, because – but you do know more than is in the complaint. And you could – I mean, the word significant is a fuzz word. I mean, you're saying significant is more than de minimis, and this was significant. But have you – if we knew that it was 2.6 percent, which is what you're now saying, and we knew that de minimis was a lot less than that, then we would know something. Well, I mean, we need Allergan to say this is the amount of bleed that our specifications provided to the FDA state would come out of an implant not ruptured. Okay. I think we've got your position. You've got three minutes left. I have one other question. May I ask one other question? Please, please. Quickly. The other thing that's not in here, and the question is does it need to be, is any obvious alternative explanation, which was that, for some reason, your client was extremely and abnormally sensitive to this material, so that even a small bleed would have – or the amount of bleed that they expected would have made her ill. And you never actually specifically negate that possibility. Do you need to? Do you need to under Iqbal? This is my first question. I don't believe we need to under Iqbal and Tuomly. I think our experts certainly will say no. I mean, she certainly had a reaction to the silicone that perhaps not every, certainly not every woman would have. But if the bleed was – but to have that kind of reaction, the bleed had to be more than de minimis. Remember, Allergan says – So you could put that into your complaint, but you haven't. I mean, what we've said is she's had clinically significant adverse reactions. And Allergan said that whatever bleeds out is going to have no clinical significant reaction. So the logistical syllogism says – They say the evidence is mixed as to whether there are any clinical consequences associated with gel bleed. No, what Allergan says is the evidence is mixed as to whether there are any clinical consequences to silicone, but it says – Silicone compounds. Silicone compounds, but it says – Which include manganese. But with respect to what the amount that bleeds, Allergan says, that we know – it says to the FDA, we are representing that the amount that bleeds will not be clinically significant. This is – I'm just now reading from your complaint, which quotes from the Allergan materials. This is now Allergan talking, quoted by you in paragraph 77. The overall body of evidence supports that the extremely low level of gel bleed, that is to say the bleed that we can anticipate from one of these implants, is of no clinical consequence. That's correct. And so if – That's what you say. And so the syllogism is, if it is of clinical consequence, then it must have been more than what Allergan anticipated would bleed out, and therefore a manufacturing defect. You're now down to 39 seconds. Let's hear it from the other side. Thank you. Good morning, Your Honors. May it please the Court. My name is Gina Marie Slattery, and I am here on behalf of Appellee Allergan. In order for a Class III medical device plaintiff to survive the express preemption clause of the MDA, they have to – I'm having trouble understanding you. Sorry. They have to prove – is that better? They have to prove that Allergan violated Federal requirement. In order to do that, they have to follow the two-prong test that's been articulated by this Court, by managing to plead the standards for Rule 8. The first thing that you look at is if you strike out all of the conclusive assertions and legal conclusions and all of the elements of the cause of action, you have to look at whether or not there are underlying facts to support a claim. You have all points. Would it be sufficient – and I'm on purpose saying this in general terms rather than talking about the actual complaint for the moment – would it be sufficient for them to plausibly allege that there is a manufacturing defect in the silicon implants that their client received? Is it plausible? I suppose it's conceivable. I don't know if it's plausible. I'm asking you a different question. Would it be sufficient for purposes of Iqbal and Rule 8a for them to plausibly allege a manufacturing defect? Yes. Okay. So the question then is, does this complaint satisfy that? That is exactly the question. And you have all individually raised the problems with the Second Amended Complaint and the reason why it's not. But the ones that we've raised, or at least the ones that I've raised, are all fixable. So imagining the complaint the way I'm imagining it, i.e., with saying that that spinning out what the pathology report actually said apparently, which is how much bleeding there was, and maybe spinning out the notion that she would have an expert say that although she may have been somewhat unusually sensitive, she wouldn't have been sensitive at non-clinically significant levels, then what? Why isn't that enough? Well, first of all, I don't know that the pathology report actually says 2.8 percent. I understand that. We were just told that. I mean, maybe it does, maybe it doesn't, but if it's a go ahead. Even if the plaintiff was given another opportunity, now the Third Amended Complaint, I don't know that it would be sufficient to articulate facts which Judge Bolton specifically identified. But the ultimate question is, does she have to, and how could she, allege what exactly was wrong in the manufacturing? She could provide more information about the facts of this case. And you've pointed out there's still not sufficient facts, even on the questions you've asked so far this morning. For one, as you pointed out, he's never connected the manganese to the silicone. Right, but that's easy. I gather it's in there, so that's number 3, the Third Amendment. We're going to connect that. Okay. Potentially, conceivably, he could argue there's a manufacturing defect, but there are two problems. The first one is, as the Court has looked at the section on the potential gel bleed under the patient label and the DFU, and as is illustrated in the Second Amended Complaint, potential gel bleeds are a known risk of the implant. It's known to occur in the absence of a manufacturing defect. That was no clinical result, and not in a significant amount. He's now saying it is a significant amount and there were clinical results, so there must be a problem. There must have been a mistake here. Well, the potential consequences of a gel bleed, as listed in the patient label and the DFU, as Judge Bea pointed out, it says small quantities, and it does say the results are mixed as to whether or not there's clinical consequence. At the bottom of that section, it says separately that we have tested these implants, and at least on the tests that we did, it appears that about 99 percent of it stays in. So Allergan hasn't taken it. I want to make sure I understand that. Sure. About 99 percent of them didn't have bleed, or we tested them and about 99 percent of the compound stayed within the implant? Ninety-nine percent of the compound stayed within the implant. Well, then if he can allege the 22.6, he has made an allegation there's something wrong here. That is just a part of what our testing is. What we have warned the patient and the physicians about is that a gel bleed can occur. The other problem is if you actually look at the entire DFU and the patient label, what we also know is a known, well-recognized risk of implants is rupture. And the reason that's significant, even though this is not a rupture case, is that we know that if you use implants, you have a risk that gel is going to escape, whether through a leak or through a rupture. Hang on a second. But in this case, the allegations of the complaint are pretty clear that she did not have a rupture. They investigated her when she began experiencing these symptoms, and the doctor said this does not appear to have ruptured. Had it ruptured, they would have acted differently and more promptly. So we have intact that it's a non-ruptured implants. And so the question is, what happens with respect to the non-ruptured implants? I agree that there's no finding of any rupture. I don't have the implants, but at least from what I understand, there was no rupture. The point is the point is I'm also after had there been a diagnosable rupture. That is to say, she goes into the doctor and says, I'm having these bad symptoms. And in the allegation of the complaint, the doctor says, there has been no rupture, so we can leave it alone. Right? That's in the complaint. One of the options, yes, was we don't see a rupture, you can leave it in. I'm not sure what rupture has to do with this case. What it has to do with this case is that because the FDA knows, and it's in all of the patient labeling and all that, gel comes out. Whether it's a small amount or a large amount through a frank tear, the gel can come out, the manganese, whatever components are in it can come out beyond the implant. That is a well-known risk. The amount that everybody is arguing about, whether or not it was a small amount or a large amount, it is a known risk of these implants. It was known before the PMA process. Kennedy. You're not taking my point. And it seems to me that this might be a very good thing for you to say at trial, but if we're talking here at the complaint stage, she makes an allegation that she had trouble with it. That is to say, she was experiencing symptoms. She goes in. The doctor says, well, it could have ruptured, so let me find out if it ruptured. The doctor says it does not appear to have ruptured, so we will leave them in. So the allegation here is not that it ruptured in the sense that it ruptured and the stuff's all over the place. The allegation, rather, is that there was a bleed and that the bleed was substantial with severe clinical consequences. And then he says, but your materials say that in normal circumstances, absent a 99% of the material stays in, and this small amount of bleed has no clinical consequence. So I don't see what rupture has to do with it or overall risk, because this is not a rupture case. This is a bleed case. That's the allegation. Now, what turns out to be true, I don't know. As to the plausibility, though, Your Honor, that's why the rupture's important. Because if you are relying on the fact that she had a significant injury to support the claim that it was a significant gel bleed or more than was expected through an intact shell, you have to look at whether it's plausible that she can, with additional discovery, prove that her injury is somehow related to the bleed as opposed to the fact it's just silicone coming out, and that's a known risk. On top of that you're saying after discovery it may turn out to be a rupture. Well, fine, then he'll lose. No, I'm not saying it's a rupture. I don't believe it's a rupture. What's the relevance to the rupture? I don't understand it. Because the allegation is that as a result of a lot of silicone and manganese coming out. Not a rupture. Not a rupture. But the gel and the silicone in the gel and the manganese came through the intact shell and caused problems. Right. My point is that there is a risk when you go in to have the procedure that gel is going to get out. Whether it's a small quantity or a large quantity, it can come out. It's not a rupture. I don't understand what you're saying. I absolutely do not. The question ultimately is whether there was a one could get a fair inference that there was a manufacturing defect here. Right? If there was a manufacturing defect, the complaint stands and goes forward. Right? Is that much right? I don't agree with that, because the manufacturing defect is not enough to survive preemption. They would have to prove that we violated some Federal requirement. Because we know that there are Wait a minute. Sorry. I thought we agreed at the very beginning that it was sufficient to state a cause of action here that plausibly alleged that a manufacturing defect caused the injury. You didn't say that? I said that it is plausible that a plaintiff, not in this case, you said, in any case, could allege whether or not there was a manufacturing defect. I don't disagree with that. But this is a Class III medical device case. What I asked you is if it were sufficient to state a cause of action that the complaint plausibly alleges that there's a manufacturing defect that causes the injury. Now, you can change your answer, but I thought your answer was that that was sufficient. It's not sufficient to survive preemption, though. It's sufficient to articulate the fact that a manufacturing defect that strikes me under Stengel is enough. That is to say, you allege it's got to be parallel and the claim is that there's a manufacturing defect. Under Federal law, you can't have a manufacturing defect. You, under Regal and the other cases which dealt with manufacturing claims as well, you can have a manufacturing defect preempted. And you have to be able to allege that not only was there a manufacturing defect, but you have to connect the alleged defect to a requirement that was violated by alleging. So your ultimate contention is that he has to identify a regulation. I mean, is this a regulation, Federal regulation, which was violated in the manufacture of this silicon implant? This plaintiff needs to articulate facts, which would. Would you answer me yes or no? Yes or no? Yes. I think that he needs to prove that there was a requirement. A particular regulation. Yes, because it's a class three medical device and the only way to survive preemption is to be able to show not just that there's any manufacturing defect, but that it's in violation. And you pointed out to the Stengel case, which is a great example, where they had facts which showed that Medtronic allegedly had information that they failed to provide to the FDA and that the FDA learned about that and sent warning letters as a result of that and a correction device letter was sent. That's information that bears on the fact of whether or not there was an actual Federal requirement violation. Let me ask you a question on that. Yes, Your Honor. On the Federal requirement, you said that there has to be an allegation of a violation of a Federal requirement, right? Yes. The Federal requirement, as I read it here, is that small quantities of low molecular weight silicone compounds can be extruded, can bleed. But large quantities would be a violation of the Federal rule, correct? I don't know that to be true, Your Honor. Oh, then small quantities means whatever quantities, 100 percent? No, it doesn't mean whatever quantities. As I said earlier, it could possibly be a manufacturing defect. It doesn't mean that when we manufactured it and there was a defect that it, there was a requirement violation. That's the point. Isn't the requirement, the Federal requirement, that no more than small quantities escape or bleed? That's the way I read this. If you're warning people that small quantities have been found through an intact implant shell and the evidence is mixed as to whether they have consequences or not, it would seem to me that medium quantities and large quantities would be a violation of the Federal requirement. Your Honor, I would disagree because the fact of a manufacturing defect does not mean that it violates. Okay. But what – where are these regulations you want us to look at? Are there a set of regulations in which the Federal government says this is how you're supposed to look on implants? Part of the PMA process would be how we are required as a manufacturer to manufacture these particular implants, yes. And where do we find these regulations? They would be with the FDA. Okay. So can you point me to the regulations? I can't point you to them. I do not have them. But that's what you're telling me wasn't alleged here. Right. Your Honor, when we received the regulations, we were assuming that this was a manufacturing defect. But the document that you put out, which was you were required to put out, as I understand it, encompasses that if you do something that's not consistent with these warnings, that there's a problem. Is that not true? Your Honor, if I might say that the – are you referring to the FDA report? Which report? No. I'm referring to the Allergan Corrections for Use document. I'm sorry. What was the question in reference to the document? If there is something – if this document says things, which it does, about what can be expected from these implants and then something else happens, is that not a Federal violation? No, Your Honor, because a manufacturing defect in and of itself is not evidence of a failure to follow the Federal requirements. So a failure to – if there is an incident that is inconsistent with representations made in these directions for use, that's not a reason? Not on its face, no, Your Honor. All right. So what are we looking at? Because – But you're not willing to tell me what I am supposed to be looking at. Your Honor, they have the burden of putting into their pleadings what they believe the factual basis and what they believe violated the Federal requirements. They can't simply say, as they did in this particular complaint, that – You know, I think we may – I think we may be talking in circles because I might have led us off a garden path in talking about manufacturing defect. Let's do it this way. When – how do I pronounce it? Allergan. When Allergan says, we want approval to market this, it says, and it's going to perform in these ways, X, Y, and Z. It then doesn't perform in these ways. It does something different to the detriment of a patient. Now, is that something that provides a cause of action? It does not survive preemption in a Class III medical case unless they can prove that the reason it didn't turn out the way it might have been expected to turn out is because we did something in violation of the Federal requirement. There's two steps to that. I think that was my question, but let me ask it again. Okay. In getting approval from the FDA, Allergan says, this product is going to behave in these ways, there will be these things that might happen. It goes on the market. You now have someone who comes in claiming injury, and they say, well, it did not perform as represented to the FDA, and because it didn't perform as represented, I have suffered injury. Does that state a cause of action? Not in a Class III medical device. Say again. Not in a Class III medical device case, because it is not enough to say there was a defect. You have to show in a ---- No, but he's not saying there's a defect. He's saying there's a violation of Federal regulations when they don't meet what they represented. Agreed if they don't, but there's nothing in here. You are relying on the fact that they're alleging a manufacturing defect occurred here. They don't say manufacturing defect in here. That was my word. They use it. Well, what I'm after is Allergan says it's going to perform this way, and you're going to have injuries only under these circumstances. The complaint comes in and says, and I'm now making up the complaint. I don't want to go back to this one. The complaint now comes in and says it did not perform as Allergan represented in getting the approval. It performed in this way instead, and the consequences that I've suffered are much worse than the consequences that Allergan promised would be the only consequences of the drug or the product that we're now putting out. And you're saying that doesn't state a cause of action? If they can show something that Allergan actually did in contravention of what we were required to do under the FDA, yes, then they would have a claim. First of all, is there, in fact, a set of specifications imposed by the Federal Government as to how you manufacture these particular devices? Yes, Your Honor, there would have to be, because it's a Class III medical device. And you don't know where it is or where to find it? I don't have them, no. And I don't have them because I'm here because they did not adequately plead any facts in the lower court to support a claim. That's why we're here before you today. And you have all asked pointed questions, all of the issues I would have brought up as to the deficiencies in the complaint and the reason we are now in the Ninth Circuit. You're saying there's a whole other problem, which is that there is some – somewhere in the world where no one wants to tell us where, a set of not generalized but very specific to this particular product requirements as to manufacture. But you're not going to tell us where? I'm sorry. I did say that the FDA would have it and Allergan would have them. And apparently I think they would have them. And you're Allergan. Allergan wouldn't have them. Could he get them? No. Could he get them at this point? He could probably do – I don't know if he did a FOIA request. Are they public? I don't think – Are they published? I don't think they're published, no. I think – Interesting. So how are we supposed to know anything about it? I think you could do a FOIA request and you might get redacted copies of the PMA. I'm going to bring this lawsuit, I've got to do a FOIA request first? Well, if you do an investigation under your Rule 11 obligations and you want to state facts sufficient to claim – But moreover, presumably there are going to be trade secret claims all over the place. Absolutely. That's why I think you get redacted versions at FOIA. Have you ever done a FOIA request? I haven't personally, but I have in my office, yes. Do you know how long they take? They can take a while. But you have two years in order to investigate your claim, which would allow you to do a PMA. That's fine, but obviously the reason why these aren't public is because they're considered to be trade secrets. Agreed, Your Honor. So you're asking him to allege a violation of a trade secret? I'm asking him to allege something more than he's alleged in this case, which is exactly what the district court found. He – she asked how you know and what you know that they violated, and he was unable to answer those questions. I know that there are cases that have required more specificity. Have they required a specific allegation as to a violation of these trade secret protected documents that are not public? I do not believe any case that I've seen has said that you have to specifically identify the actual provision or SOP that shows there's a violation. And that's what you're asking him to hold that? I'm not asking him to hold exactly that, but I'm asking for more than just the words we violated a Federal requirement without any evidence of that happening. I think I'm hearing you say that he's got to put into the complaint, here's the secret rule that I could get only by FOIA, and they violated that secret rule, but I don't know what it is yet. But I might be able to discover it if I'm allowed to go forward with the lawsuit. I think that's what you just told me. I don't think I'm that – quite that far to the extent. What you said in your brief was, when you cited a case that had been cited by the plaintiff, that what went wrong in that case, in the manufacturing process, plaintiff must identify and cite the relevant FDA manufacturing standards that were allegedly violated. What you're saying here is he hasn't alleged any – or she hasn't alleged any FDA standards that were allegedly violated. Is that correct? Correct. And that means that what we've been reading from, you claim, is not an FDA standard? It's been approved by the FDA as our warning. That is absolutely part of the PMA process, yes. But it isn't an FDA standard. So you're saying she has to point to an FDA standard that was violated by Allergan? Yes. I don't think that this satisfies that. And you're also saying that those FDA standards are not public and are, if available at all through FOIA, are going to be available in a redacted fashion because of trade secret problems? I'm saying that I think that there's more that needs to be alleged to show it. If you look at the – Why are you not answering? That is what you're saying. Give me an example of what you could allege that isn't based on the document we've been looking at and isn't based on the secret regulations or requirements. That would be okay. If you look at Bass, which plaintiffs cited, Bausch, Stengel, each one of those plaintiffs alleged facts. Under these circumstances, with regard to this, what those were – at least Stengel was about warnings, as I understand it. It was. You're saying that's not good enough. So what specifically could he allege if he can't rely on the company's own representations and everything else is secret? If you look at Bass from the Fifth Circuit and Bausch from the Seventh Circuit,  And in those cases, the plaintiffs were able to allege that there was a problem But were those pleading cases? Yes. There were preemptions. They were mixed. There was a preemption and then There's at least some of the cases you're relying on. Were not Rule 8 pleading cases. Correct. They were cases that had actually been proved at trial on summary judgment. Both of those cases, I believe, are on the pleading level. Okay. And both of them had a lot of facts to support a potential claim in violation of the federal requirements. The FDA came in and did an inspection and found that they had not done the final rinse properly in the Bass case. And as a result of that, they issued warning letters. Similarly, in the Bausch case, the plaintiff was able to put into the initial pleading that in addition to their own injury, that there were dimensional anomalies in the prosthesis itself, and that, again, the FDA had come in and done an inspection. The PMA, while important, isn't the only thing that you could obtain from the FDA. You could go to the FDA to find out if there's been inspections, if they failed inspections. Mr. Counsel. Yes, Your Honor. Is it your position that the potential health consequences of gel bleed that I've been reading to you from and which Judge Fletcher has been reading to you from is not a standard of the FDA for the manufacture of your gel implants? I can only answer that by saying that the FDA also considered a large amount of gel getting out. Whether you say this is because of bleed or not, they have considered in the spectrum of gel that can come out and cause potential issues, and that there's no evidence, based on all of the scientific data, that there is an injury. Please answer this question. Sure. And I don't know if you know much more about the FDA than I do, but when you represent, when Allergan represents that this is the potential health consequences of gel bleed, small quantities, maybe one way or the other, but in 99% of the cases, or 99% stays in. Is manufacture of a breast implant that violates this representation a violation of the FDA regulations? I think that you're asking me more of a warnings question than a manufacturing question. This case is about the manufacturing. I'm looking at Bausch, which, all right. Bausch says, first of all, that you don't have to allege a specific regulatory requirement, number one. Although the complaint would be stronger with such detail, we do not believe the absence of those details shows a relate problem. Secondly, you, without discovery, is not going to be able to tell whether the implant exactly what, say, uses airbag example and says that it's common for insured plaintiffs to plead both defective manufacture and defective design, can't tell which third. With regard to class three medical devices, much of the critical information is kept confidential as a matter of public law. The specifications of the FDA's premarket approval documents are confidential. There's no public access. An insured plaintiff cannot gain access to that information without discovery. C-21 CFR 814.9. So it seems to me that Bausch is, you know, completely inconsistent with the representation you're making as to what he had to allege. Your Honor, what I said earlier about the Bausch case was I looked specifically and referred the Court to the actual facts they pled in there, which could give plausible claim that they were entitled to relief, because they actually had in their complaint that there was a problem with the hip prosthesis and that the FDA went in, did an inspection. Unless the FDA is involved in complaining about it, you can't do it. No. I'm not saying that either. But I'm saying that in these particular cases that you look at where they were able to overcome the preemption. Okay. We got it. We took you over. Sorry. No, we were doing it in the questioning. Thank you very much. Thank you, Your Honors. I think you've saved 36 seconds. Yeah, I'm talking to you. So this is why the Basque Court in the Fifth Circuit says doing what Allergan would require me to do would make it impossible to plead a parallel claim. I mean, what she expects me to do when I have a client who's going blind because of exposure to silicone from a breast implant that did not rupture, I'm supposed to go to Allergan's documents, find out what their manufacturing process was, find out whether or not they had what kind of standards they did when manufacturing each of these gels, what kind of testing they do. I'm supposed to do all of that before I file the complaint? That would make it impossible. Got it. Thank you. Weber v. Allergan submitted for decision.
judges: W. Fletcher, Berzon, Bea